453 S.E.2d 603

The WHEELING CLINIC, a Partnership,
Plaintiff Below, Appellant,

v.

Byron L. VAN PELT, Defendant
Below, Appellee.

No. 22309.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 14, 1994.

Decided Dec. 9, 1994.

Herbert G. Underwood, Gordon H. Copland, Steptoe & Johnson, Clarksburg, for appellant.

William E. Parsons, II, Parsons, Thompson & Kelly, Wheeling, for appellee.

McHUGH, Justice:

This is an appeal from the final judgment of the Circuit Court of Ohio County, West Virginia, which upheld the validity of a covenant not to compete contained in a partnership agreement but which held that the liquidated damages provision contained in that same agreement was unenforceable to the extent of fifty percent of the agreed damages. The partnership, the Wheeling Clinic (hereinafter "the Clinic"), appeals the circuit court's decision insofar as it determined that the liquidated damages provision was a penalty clause and thus, unenforceable as to one hundred percent of the agreed damages.

In his cross-assignments of error, the appellee, Byron L. Van Pelt, M.D., asserts that the circuit court erred in reinstating the liquidated damages provision calling for a sum equal to fifty percent of a departing partner's annual earnings and that the circuit court further erred in ruling that the covenant not to compete was valid.

This Court has before it the petition for appeal, all matters of record and the briefs and arguments of counsel. For the reasons stated below, the judgment of the circuit

court is reversed insofar as it held that liquidated damages of one hundred percent of Dr. Van Pelt's earnings for the year prior to his departure was a penalty rather than liquidated damages.

## I

Dr. Van Pelt, an internal medicine specialist, became employed by the Clinic, a medical partnership, in 1974.[1] On July 1, 1975, Dr. Van Pelt signed a partnership agreement with the Clinic. Included in the agreement was a covenant not to compete under which each partner agreed that a partner who left the partnership, either voluntarily or involuntarily, would not practice medicine within thirty miles of the Clinic for a period of two years. The partnership agreement was subsequently amended to include a liquidated damages clause which provided that, if a departing partner chose not to leave the area for the requisite two-year period, he or she agreed to pay to the partnership fifty percent of his or her preceding year's aggregate earnings from the partnership.[2]

On April 12, 1988, the partnership agreement was again amended, increasing the amount of liquidated damages to 100% of the departing partner's "aggregate earnings from the partnership ... for professional services rendered to the partnership in the twelve (12) calendar months immediately preceding the effective date of his retirement from the partnership."[3] The newly amended partnership agreement was adopted unanimously by all partners present at the meeting.[4]

On October 31, 1989, Dr. Van Pelt resigned from the partnership,[5] at which time he began practicing internal medicine approximately one mile from the Clinic. In a letter to the partnership, Dr. Van Pelt indicated that he had violated the covenant and that, accordingly, he was liable to the partnership for money damages "totaling one year's income." In that same letter, however, Dr. Van Pelt asked that the damages provision be waived or that the amount be reduced. The partnership refused and subsequently instituted a lawsuit against Dr. Van Pelt, seeking enforcement of the covenant not to compete.[6]

1. Dr. Van Pelt was initially hired at the Clinic as an employee. He became a partner one year later.

2. The Clinic enforced this provision against three partners who left the Clinic and who chose to violate the covenant not to compete. Dr. Van Pelt was still a partner in the Clinic at that time and benefitted from the liquidated damages collected by the Clinic.

3. Article V, paragraph 9(b) of the amended partnership agreement of April 12, 1988 states, in pertinent part:

(b)(1) Each partner who shall either voluntarily or involuntarily retire or withdraw from the partnership shall be prohibited from engaging in the practice of medicine and/or surgery, or any branch thereof, at any location within a radius of thirty (30) miles of the principal offices of the partnership in the City of Wheeling, West Virginia, within the period beginning as of the effective date of his retirement or withdrawal and ending two (2) full years thereafter. The provisions of this subparagraph (b)(1) shall have no application to any partner retired upon the attainment of age seventy (70), nor to a partner retired upon a permanent disability.

(b)(2) Any retiring partner who shall violate the covenant not to compete described in subparagraph (b)(1), above set forth, shall pay to the partnership as agreed liquidated damages

and not as a penalty such sum as shall equal his aggregate earnings from the partnership as he shall have received, or have been entitled to receive, for professional services rendered to the partnership in the twelve (12) calendar months immediately preceding the effective date of his retirement from the partnership.

4. Though Dr. Van Pelt was not present at that meeting, he subsequently voiced no objection to the adoption of the liquidated damages provision until the Clinic sought enforcement of it against him.

5. Apparently, Dr. Van Pelt, along with other partners who had previously left the partnership, believed there was mismanagement of funds within the Clinic, in that their take-home pay was significantly less than their billings. We note that the circuit court found that this alleged mismanagement does not relieve Dr. Van Pelt from his obligation under the covenant not to compete. Dr. Van Pelt does not allege error on this issue.

6. From 1989 until 1991, the Clinic instituted thirteen lawsuits against former partners to enforce the covenant not to compete. The lawsuit against Dr. Van Pelt is the first of these lawsuits and was consolidated, upon Dr. Van Pelt's motion, with the lawsuit against Dr. Srinivasan Govindan. However, on August 21, 1992, Drs. Van

On February 28, 1992, the parties filed cross-motions for summary judgment.[7] In a memorandum decision, dated August 2, 1993, the circuit court ruled on the cross-motions for summary judgment. The circuit court upheld the validity of the covenant not to compete contained in the partnership agreement, but held that the liquidated damages provision was only enforceable to the extent of fifty percent of the agreed damages.[8]

On July 28, 1993, proceedings were held to determine the total income against which the 50% damages calculation should be applied.[9] There was much dispute as to the meaning of the liquidated damages provision, which required a departing partner who violated the covenant not to compete to pay 50% (and subsequently, 100%) of his or her "aggregate earnings from the partnership . . . for professional services rendered to the partnership in

the twelve (12) calendar months immediately preceding the effective date of his retirement from the partnership." In a decision dated March 9, 1994, the circuit court found that, although the partnership agreement failed to define the phrase "aggregate earnings . . . for professional services rendered to the partnership," such "aggregate earnings" includes "the aggregate of salary and bonus for a partner paid within the last twelve (12) months preceding withdrawal form the partnership." The circuit court further found that, based upon the unambiguous language contained in certain enumerated provisions in the agreement,

> the proper method of calculating the liquidated damages of Dr. Van Pelt under Article V, Paragraph 9(b) is to base the calculation on the aggregate of the total salary and bonus received by [Dr. Van Pelt] during the twelve (12) months next preceding

Pelt and Govindan sought and were granted separate trials, on the grounds that a single trial would be prejudicial because Dr. Govindan, while still a partner in the Clinic, had voted to sue Dr. Van Pelt.

7. The trial court invited counsel for defendants in the other twelve cases, which had been consolidated for pre-trial purposes, to submit briefs on the pending summary judgment motions, and to participate in oral argument on the summary judgment motions.

8. In its memorandum decision of August 2, 1993, the circuit court stated, in relevant part:

> The 1971 provision in the Wheeling Clinic partnership agreement which provided that any person who violated the restrictive covenant would be required to pay, as liquidated damages, one-half of his prior years' earnings is a proper liquidated damage provision and enforceable under West Virginia law.
>
> . . . .
>
> At the time the contract was formed, it was impossible to pinpoint the damages to be suffered by the Clinic by doctors who chose to breach the covenant. The clause for damages is clearly not grossly disproportional in comparison to the damages which could actually be incurred. The Court is satisfied that there was no acceptable method available to actually pinpoint the amount of damages that would or could be sustained in the event of a breach of the covenant.
>
> . . . .
>
> The 1988 amendment to the partnership agreement is another matter. The partnership agreement was amended to provide that the partner who violated the restrictive covenant would pay, as "liquidated damages", a sum

equal to 100% of his prior years earnings. The increase of the liquidated damages clause from 50 to 100% is a "penalty" because it was done to act as a deterrent to prevent doctors from leaving the Clinic. . . .

> The partnership changed the liquidated damages clause from 50 to 100% for reasons which were not based upon proportionality. The Court has already concluded that the 50% damages clause was not disproportional in comparison to the damages actually incurred when the partners violated the agreement. But there is nothing in the record to indicate that the 100% figure was a fair estimate of the damages to be suffered as the result of the breach. There is nothing in the record to show that the 100% liquidated damages figure bears any reasonable relation to the damages that might be reasonably expected to result from a breach. There is nothing in the record to show that a good faith effort was made by the partnership to reasonably estimate the monetary loss which probably would be sustained in the event of a breach to justify a change from 50% to 100%. There are, however, reasons for this Court to infer that the change was made to keep doctors from leaving the Clinic. Thus, this Court concludes that the 100% damages clause in the partnership agreement is a penalty clause and for that reason is unenforceable.

9. As we indicated earlier, the circuit court granted the severance motions of Drs. Van Pelt and Govindan. Therefore, the July 28, 1993 proceedings concerning calculation of damages applied solely to Dr. Van Pelt. The proceedings in the remaining twelve lawsuits are being held in abeyance, by agreement of the parties thereto, pending the outcome of this appeal.

his effective date of withdrawal (i.e. November 1, 1988, through October 31, 1989) as based upon the 'Income Sheets' of the partnership for Van Pelt.[10]

(footnote added). The circuit court calculated the liquidated damages owed to the Clinic by Dr. Van Pelt to be a net income of $8,596.12.[11]

10. The circuit court further found:
The total salary and bonus for said twelve (12) month period was $80,253.00, paid by [the Clinic] to [Dr. Van Pelt] 'for professional services rendered to the partnership' as contemplated in Article V, Paragraph 9(b)(2) of the Articles of Partnership[.]

Excluded from the calculation of liquidated damages under Article V, Paragraph 9(b) are other IRS Form K–1 items, including the following:

(a) Interest income;

(b) Payments guaranteed by the [Clinic] to partners which consists of the 1% per month payment to Dr. Van Pelt of the value of his capital account (Recognition of Capital Investment under Article VI, Paragraph 1(B) of the Articles of Partnership);

(c) Payments paid by the [Clinic] to Van Pelt at the rate of 1% per month due to his stock ownership in the Wheeling Clinic Realty Co., Inc., owner of the physical plant which housed the plaintiff [Clinic] (also Recognition of Capital Investment under Article VI, Paragraph 1(B));

(d) Accident and health insurance premiums;

(e) Continuing medical education payments;

## II

The Clinic's first assignment of error is that the trial court erred in ruling, as a matter of law, that the liquidated damages provision calling for a sum equal to 100% of a departing partner's annual earnings was really a penalty and, therefore, unenforceable.[12]

(f) Management fees paid to partners of the plaintiff paid by The Wheeling Clinic Realty Co., Inc.;

(g) Liquidated damages paid by other departing partners to the [Clinic];

(h) Charitable contributions; and

(i) Non-deductible expenses

all of which were reported on [Dr. Van Pelt's] Schedule K–1 (Form 1065), but which are not to be included in "aggregate earnings from the partnership ... for professional services rendered," due to the finding of this Court that such items are not earnings *"for professional services rendered."* (See [Dr. Van Pelt] Exhibit No. 15–Article V [sic], paragraph 1(A), which specifically excludes "rents, dividends, interest" from "income and profits" received from "the practice of medicine and surgery;" [Dr. Van Pelt] Exhibit No. 18–Article VI, Paragraph 1(B)—and testimony of Douglas Anderson, former Business Manager and Director of Finance and Operations of the Wheeling Clinic.) (emphasis in original).

11. The circuit court calculated the liquidated damages, pursuant to article V, paragraph 9(b) of the partnership agreement, as follows:

A. Salary:

| | |
|---|---|
| November and December 1988 | $ 4,000.00 |
| January–October 1989 | 20,000.00 |

Plus

B. Bonus:

| | |
|---|---|
| November and December 1988 | $ 9,407.00 |
| January–October 1989 | 48,846.00 |
| Total Subject to Liquidated Damages | $80,253.00 |
| Total Subject to Liquidated Damages × 50% | = $40,126.50 |
| Less Capital Account as of June 30, 1989 | − 31,530.38 |
| NET AMOUNT OWED BY DR. VAN PELT TO THE CLINIC FOR VIOLATION OF COVENANT NOT TO COMPETE | 8,596.12, plus interest at the rate of 10% per annum from November 1, 1989 |

It is not disputed that Dr. Van Pelt's interest in the capital account ($31,530.38) should be set off from the amount of liquidated damages owed.

12. This Court has previously noted the distinction between a penalty and a liquidated damage

clause to be significant. A provision which is considered a penalty is generally deemed void and recovery is limited to actual damages. Conversely, a provision held to be for liquidated damages is to be enforced according to its terms.

■ The question of whether the provision calling for 100% of a departing partner's annual earnings is an unenforceable liquidated damages clause or an invalid penalty was a question of law ascertainable by the circuit court on summary judgment. 22 Am. Jur.2d Damages § 692 (1988). This Court has recently held that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).[13] Furthermore, it is well established that:

> 'A motion for summary judgment may only be granted where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.' Syllabus point 2, *Mandolidis v. Elkins Indus., Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978).

Syl. pt. 3, *Thomas v. Raleigh General Hospital,* 178 W.Va. 138, 358 S.E.2d 222 (1987). We find that Dr. Van Pelt did not successfully carry his burden of proving that the liquidated damages provision was a penalty and, therefore, unenforceable.

■ In syllabus point 1 of *Stonebraker v. Zinn,* 169 W.Va. 259, 286 S.E.2d 911 (1982), we discussed the criteria by which a valid liquidated damages clause may be distinguished from a penalty:

> Parties may properly contract for liquidated damages (1) where such damages are uncertain and not readily capable of ascertainment in amount by any known or safe rule, whether such uncertainty lies in the nature of the subject, or in the particular circumstances of the case; or (2) where from the nature of the case and tenor of

the agreement, it is apparent that the damages have already been the subject of actual fair estimate and adjustment between the parties.

We agree with the circuit court's determination that the exact amount of monetary damages resulting from a departing partner's breach of the covenant not to compete was uncertain and incapable of ascertainment by any acceptable method.[14] *Id.* Such damages include the obvious lost revenues from patients who choose to continue to see the departing partner at his new location; the loss of patient referrals from the departing partner to the remaining partners; the loss of the departing partner's billing power; the costs of the Clinic's overhead which remain after a partner leaves and which must be spread among the fewer, remaining partners; the damage to the Clinic's reputation due to the loss of a "name" physician; costs of recruiting another physician. The amount of such anticipatory expenses and losses is not susceptible to determination,[15] yet they are almost certain to occur. *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276 (Ind. 1983). *See Geisinger Clinic v. Di Cuccio,* 414 Pa.Super. 85, 606 A.2d 509 (Ct.1992); *Harris v. Primus,* 450 N.E.2d 80 (Ind.Ct. App.1983). The parties, therefore, properly contracted for liquidated damages. Syl. pt. 1, *Stonebraker, supra.*

In its memorandum decision, the circuit court determined that the Clinic's "intent" in amending the damages provision from 50% to 100% of the departing partner's earnings was to deter physicians from leaving the partnership and setting up their own practice within the protected area,[16] and thus, constituted a

*Stonebraker v. Zinn,* 169 W.Va. 259, 262 n. 3, 286 S.E.2d 911, 913 n. 3 (1982) (citations omitted).

13. We note that there is no dispute by the parties that the issue of whether the agreed damages provision is for liquidated damages or a penalty is a question of law for the circuit court. Indeed, the parties filed cross-motions for summary judgment on this issue.

Conversely, the calculation of damages was the subject of separate proceedings held by the circuit court without a jury. Thus, as will be discussed below, our review of the circuit court's decision concerning the calculation of damages is whether his findings of fact were clearly wrong. *See, e.g., Creasy v. Tincher,* 154 W.Va. 18, 173 S.E.2d 332 (1978).

14. *See* n. 8, *supra.*

15. In that the damages likely to flow from a departing partner's violation of the covenant not to compete are unquantifiable, it was not necessary, at the time the liquidated damages provision was amended in 1988, that the Clinic conduct or attempt to conduct a formal financial study thereof.

16. As we indicated above, the covenant not to compete restricted a departing partner from practicing within thirty miles of the Clinic for a period of two years.

penalty. The circuit court's determination of the parties' intent was unwarranted and its reliance thereon, misplaced.

The only sense in which the intention of the parties can have any meaning ... is an intention to name a sum that is fixed in good faith as the equivalent of the injury which will probably be caused by breach of the contract, rather than an attempt to secure performance by a provision for an excessive payment.

'Intention of the parties' is, however, a misleading and undesirable designation for this requirement, and the first step towards clearing the confusion of the law on the subject is to drop the use of the phrase from the discussion. Even the suggested substitute of an inquiry whether the parties in good faith attempted to estimate the real injury is a somewhat artificial cloak for the true principle.

The only evidence that the court ever has before it bearing on the issue whether the parties in good faith made such an estimate, besides their statement in the contract that the sum named is liquidated damages, or a penalty (and to this, as has been seen, the court rightly pays little attention) is the reasonableness in fact of the amount; and the matter would be much simplified if it were clearly recognized and stated that the reasonableness of the agreed sum looked at as of the time when the contract was made is the only important thing.

5 Samuel Williston and Walter H.E. Jaeger, *Williston on Contracts*, § 778 at 693–4 (3d ed.1961) (footnotes omitted). *Accord Wassenaar v. Panos*, 111 Wis.2d 518, 331 N.W.2d 357 (1983).

■ This notion of reasonableness is reflected in syllabus point 3 of *Stonebraker, supra*, in which we cautioned that a liquidated damage clause will not be upheld where the agreed damages is grossly disproportional to the actual damages: "A clause for damages in a contract is a penalty rather than a liquidated damage provision when the amount is grossly disproportional in comparison to the damages actually incurred. This is true even though the provision is denominated as liquidated damages in the contract." *See also* syl. pt. 1, *W.Va Pub. Emp. Ins. v. Blue Cross Hospital Serv.*, 174 W.Va. 605, 328 S.E.2d 356 (1985).

■ Thus, in determining whether a clause in a contract stating a sum to be paid in the event of a breach of the contract is liquidated damages or a penalty, the important question is not the intention of the parties but rather the reasonableness in fact of the agreed sum when the contract was made.

As will be discussed below, liquidated damages in the amount of 100% of Dr. Van Pelt's "aggregate earnings" [17] for the year prior to his departure, are reasonable and not grossly disproportional to the damages incurred.

## III

■ The Clinic's second assignment of error is that the trial court erred in restricting the liquidated damages to Dr. Van Pelt's "salary" and "bonus" payments.[18] As we indicated above, article V, paragraph 9(b)(2) set liquidated damages in an amount equal to 100% of "aggregate earnings from the partnership ... for professional services rendered to the partnership in the twelve (12) calendar months immediately preceding the effective date of his retirement from the partnership." However, the phrase "aggregate earnings" was neither defined in the partnership agreement nor in any of the Clinic's policies. Thus, Dr. Van Pelt's "aggregate earnings ... for professional services rendered to the partnership" for the purposes of calculating liquidated damages owed to the Clinic was determined by the circuit court, sitting as a trier of fact. It is well settled that " '[f]indings of fact made by a trial court may not be set aside by this

---

**17.** According to article V, paragraph 9(b)(2) of the partnership agreement, the liquidated damages are based upon the departing partner's *earnings* as opposed to his *billings*. For whatever reason, the partners' earnings were much lower than their billings. *See* n. 5, *supra*. *See Henshaw v. Kroenecke*, 656 S.W.2d 416 (Tex.

1983) (agreed damages in the amount of one year's average billing by the departing partner in a management consulting business deemed reasonable and upheld as liquidated damages).

**18.** *See* n. 10, *supra*.

Court on appeal unless clearly wrong.' *Lewis v. Dils Motor Company, et al.,* Point 2, Syllabus, 148 W.Va. 515 [, 135 S.E.2d 597].'' Syl. pt. 3, *Creasy v. Tincher,* 154 W.Va. 18, 173 S.E.2d 332 (1970). *See also Vandetta v. Yanero,* 157 W.Va. 220, 224, 200 S.E.2d 674, 676 (1973).

■ In proceedings held July 28, 1993, the circuit court heard the testimonies of various witnesses and, accordingly, made detailed findings of fact based thereon. *See* n. 10, *supra.* The Clinic presented the testimony of three of its current partners,[19] who understood the partnership agreement to provide for liquidated damages in the amount of "how much you made last year." Furthermore, the Clinic introduced evidence that, when it enforced the previous "50% liquidated damages provision" against three of its partners who violated the covenant not to compete, those partners paid damages based on the *total* income earned by them.[20]

Conversely, Dr. Van Pelt presented the testimony of Douglas Anderson, the Clinic's former director of finance and operations. Mr. Anderson testified that it was the general understanding of the partners that the amount of liquidated damages owed by a partner who violates the covenant not to compete was determined by adding salary, bonus and year-end interest income monies together.[21] Though the Clinic did not agree with Mr. Anderson's calculations and, in fact, had never applied his "formula," the circuit court, nevertheless, heard his testimony concerning the meaning of "aggregate earnings ... for professional services rendered" and found it to be the proper method by which liquidated damages should be calculated.[22] While this Court may have decided this issue

differently, we cannot say this finding of fact was clearly wrong. *Creasy, supra.*

We, therefore, uphold the circuit court's findings concerning the calculation of liquidated damages. This method of calculation, as it applies to 100% of Dr. Van Pelt's earnings for the 12 months preceding his departure from the Clinic, is not unreasonable or grossly disproportionate to the damages incurred as a result of Dr. Van Pelt's breach of the covenant not to compete. *Stonebraker, supra.*

## IV

■ We shall briefly address Dr. Van Pelt's cross-assignment of error that the circuit court erred in ruling, as a matter of law, that the covenant not to compete contained in the partnership agreement was valid.[23] It is Dr. Van Pelt's contention on appeal that, in the event this Court does not reverse the circuit court on this issue, then this case should be remanded for further factual development and a jury trial. This issue was determined by the circuit court on summary judgment, and, accordingly, shall be reviewed by this Court *de novo.* Syl pt. 1, *Painter, supra.* Furthermore, as we stated earlier, "[a] motion for summary judgment may only be granted where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Syl. pt. 3, *Thomas, supra* (citation omitted).

In its opinion of August 2, 1993, the circuit court stated:

The Court has been 'encouraged' to dispose of several issues in this case by Summary Judgment.

19. The Clinic presented the testimony of Dr. William Noble and, by proffer, the testimonies of Drs. Ward and Holloway. Drs. Ward and Holloway did not actually testify, as the parties stipulated that their testimony would have been the same as that of Dr. Noble.

20. Excluded from the partners' "total income" was the investment income received by the Clinic and the management fee paid to the partnership by The Wheeling Clinic Realty Corporation. The clinic does not argue, in this case, that these items should be included in the assessment of liquidated damages owed by Dr. Van Pelt.

21. Mr. Anderson's testimony referred to a memorandum he prepared, dated January 27, 1988, concerning the liquidated damages owed by former partner Dr. Vilja Stein.

22. *See* n. 10 and 11, *supra.*

23. Dr. Van Pelt's second cross-assignment error is that the circuit court erred in reinstating the liquidated damages provision calling for 50% of a partner's earnings for the year prior to his departure from the Clinic. In light of our resolution of this case, it is not necessary to address this issue.

Although well aware of the limited use of summary judgment in West Virginia, the Court has been persuaded that the issues which follow should be ruled upon as a matter of law. Unlike the inadequate record in *Reddy v. Community Health Foundation of Man*, 171 W.Va. 368, 298 S.E.2d 906 (1982), this case and the issues that follow have been fully developed and are sufficient to provide a factual basis for the application of the legal principles of *Reddy* and *West Virginia Employees Insurance Board v. Blue Cross Hospital Services Inc.*, 174 W.Va. 605, 328 S.E.2d 356 (1985).

I conclude and find the following on the issues raised by the motions filed in this case.

1. At all times during which Defendant Van Pelt ... [was] in partnership with the Wheeling Clinic, the Wheeling Clinic partnership agreement contained a covenant not to compete, under which every partner agreed not to practice medicine within thirty miles of the Wheeling Clinic for a period of two years after leaving the partnership. I find that under West Virginia law that covenant is reasonable on its face—it is reasonable in scope and duration and presumptively enforceable. As discussed in these findings and conclusions, there are legitimate interests of the [Clinic] implicated in the enforcement of the covenant. [Dr. Van Pelt] [has] not rebutted the presumptive enforceability of the covenant....

The time and area limitations in the challenged covenant are not excessively broad. There is no reason, based upon the record in this case to conclude that the covenants were designed to intimidate rather than to protect the partnership's business. See *Reddy v. Community Health Foundation of Man*, 171 W.Va. 368, 298 S.E.2d 906 (1982).

. . . .

The challenged covenant did not prohibit [Dr. Van Pelt] from treating former patients. The agreement had an escape clause: pay 50 percent of your prior years earnings and remain in Wheeling. Unlike the liquidated damages clause in *Humana*

*Medical Plan, Inc. v. Jacobson*, 614 So.2d 520 (Fla.1992), which required the defaulting doctor to pay $700 for each former patient he treated at his new location, [this] ... [doctor] could have relocated thirty miles from Wheeling and still have been easily accessible to [his] patients. No doctor/patient relationship was jeopardized by the challenged covenant.

Furthermore, within the above discussion, the circuit court in a footnote, stated, in relevant part:

The parties filed cross motions for Summary Judgment. Numerous briefs were filed on behalf of each party and the Court was prevailed upon to rule prior to trial. The [Clinic] assserted that: 'A very large number of issues relating to the enforcement of restrictive covenants are purely legal issues and, to the extent there are any possible factual issues, the parties are largely in agreement to the facts in the case.' Wheeling Clinic's Summary of Arguments, June 8th, 1993.

[Dr. Van Pelt] argued that based on the pleadings, depositions, documents produced and interrogatory answers, there was no genuine issue as to any material fact in this case and that [he] [was] entitled to a judgment as a matter of law on the issue of:

1. The restrictive covenant in issue and the use of the covenant.

Dr. Van Pelt, on motion for summary judgment, submitted to the circuit court that there was no genuine issue of material fact on the issue of the enforceability of the covenant not to compete. However, upon receiving an adverse ruling on that issue, Dr. Van Pelt now asserts, on appeal, that the enforceability issue was *not ripe for decision* and should be remanded for further factual development and tried by a jury. While it may now suit Dr. Van Pelt to make this argument to this Court, we find it to be disingenuous and without merit.

V

For the reasons stated herein, this Court affirms that part of the decision of the Circuit Court of Ohio County which upheld the

validity of the covenant not to compete. We reverse the circuit court's decision that the liquidated damages provision calling for 100% of Dr. Van Pelt's aggregate earnings for the year prior to his departure from the Clinic was unenforceable as a penalty. However, we affirm the circuit court's method of calculation of the liquidated damages. We, therefore, remand this case to the circuit court to calculate liquidated damages of 100% of Dr. Van Pelt's aggregate earnings for professional services rendered to the Clinic for the twelve calendar months preceding his departure from the Clinic.

Affirmed, in part, Reversed, in part, and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.